Affirmed and Memorandum Opinion filed April 28, 2005









Affirmed
and Memorandum Opinion filed April 28, 2005.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00220-CR

____________

 

IVERY CEDRIC
BARNES,
Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 405th
District Court

Galveston County, Texas

Trial Court Cause No. 02CR1260

 



 

M E M O R A N D U M   O P I N I O N

Appellant Ivery Cedric Barnes was
convicted by a jury of capital murder and, because the State did not seek the
death penalty, was sentenced to life in the Texas Department of Criminal
Justice, Institutional Division.  In four
issues, he challenges the legal and factual sufficiency of the evidence
supporting his conviction.  We affirm.

I.        Factual
Background








The indictment charged that on or about
March 21, 2002, appellant “intentionally cause[d] the death of an individual,
namely James Gaines, by shooting the said James Gaines with a handgun, and the
defendant was then and there in the course of committing or attempting to
commit the offense of robbery of James Gaines.” 
At trial, the evidence showed that on March 20, 2001, James Gaines, who
held three jobs, completed his shift at a Chevron gas station in La
Marque.  Before he left, he purchased
some cigarettes and a six-pack of Smirnoff Ice. 
He told a coworker that the Smirnoff Ice was for his friend,
“Youngster,” and he talked about wanting to have sex with Youngster that
night.  Gaines left work and picked up
appellant some time after 11:00 p.m. and drove appellant to his home.  At the time, appellant was armed with a .357
magnum handgun.

At Gaines’s home, appellant apparently had
one Smirnoff Ice.  At around 11:20 p.m.,
Gaines went to his bedroom and telephoned a female friend, Yolanda Cole.[1]  Around 12:10 or 12:15 a.m., after Gaines and
Ms. Cole had been speaking for about an hour, the phone line suddenly went
dead.  The telephone was later found on
the floor of Gaines’s bedroom, disconnected from the wall.  A savings bank in the shape of a parking
meter was also found broken open on the bedroom floor, with most of its
contents missing.  Additionally, a canvas
bag Gaines regularly used to carry his personal belongings was found on the
floor with the contents dumped out.

At 12:23 a.m., Gaines was recorded
withdrawing $200 from a drive-though ATM at the Galveston County Federal Credit
Union.  This amount is the maximum
generally allowed.  Surveillance video
showed only Gaines in his Isuzu Rodeo, but appellant was in the back seat of
the car.  After Gaines got the money,
they drove a short distance and stopped on a dark street.  Both Gaines and appellant got out of the
car.  Appellant shot at Gaines three
times, hitting him twice.  One bullet
entered the left side of Gaines’s neck and exited just behind the right
earlobe; the other bullet hit him in the left side of his back, and lodged
under his right arm.  Gaines died at the
scene.








Appellant got in the Isuzu Rodeo and drove
a short distance to an acquaintance’s apartment, where he used the telephone to
call someone to pick him up.  Appellant
also threw the handgun in some bushes, but later returned for it and sold it to
another individual.  The police found the
Isuzu Rodeo at the apartment building on the day Gaines was killed; in it were
five bottles of Smirnoff Ice and the receipt from the ATM for Gaines’s $200
withdrawal.  During the course of the
investigation, appellant contacted the police and ultimately gave several
statements.  Appellant initially denied
having any knowledge of Gaines’s murder.[2]  Later, however, he admitted that he shot
Gaines.  The police also located the .357
magnum handgun, and appellant identified it as the gun he used to shoot
Gaines.  Appellant was charged with
capital murder.

At trial, appellant’s defense relied in
part on some of the things appellant said in his various statements.  Appellant contended that he went to Gaines’s
house that night because Gaines agreed to prepare his income tax return and
loan him $250.  At Gaines’s home,
appellant fell asleep, but later awoke to find Gaines performing oral sex on
him.  Appellant then asked to go
home, and they got back in the Isuzu Rodeo and drove to the ATM machine where
Gaines withdrew the money while appellant gathered his income tax papers in the
back seat.  After they left the ATM
machine and drove a few blocks, they got in an argument.  They got out of the car, Gaines attacked
appellant, and appellant shot Gaines in self defense.  The jury rejected appellant’s contention that
he acted in self-defense and convicted him of capital murder as alleged in the
indictment.

II.       Analysis
of Appellant’s Legal and Factual Sufficiency Issues








In his first and second issues, appellant
contends the evidence is legally and factually insufficient to support his
conviction because it fails to prove that appellant intentionally caused
Gaines’s death.  In his third and fourth
issues, appellant contends the evidence is legally and factually insufficient
to support his conviction because it fails to prove that appellant
intentionally caused Gaines’s death while in the course of committing or
attempting to commit a robbery.  We
disagree and affirm appellant’s conviction.[3]

Appellant discusses all four of his issues
together, so we will do the same.  He
contends no evidence was introduced to counter his statements that (1) Gaines
sexually assaulted him, and (2) Gaines agreed to prepare his income tax return
and lend him $250.  He also contends, in
a conclusory fashion, that no evidence supports a finding that appellant robbed
Gaines or that he intentionally caused Gaines’s death while robbing him.  Appellant points to several of his statements
to support his claims.  We apply the
standards of review applicable to criminal cases to appellant’s claims.  See Jackson v. Virginia, 443 U.S. 307,
319 (1979); Johnson v. State, 23 S.W.3d 1, 7–11 (Tex. Crim. App.
2000).  

As set out above, the evidence shows that
when appellant came to Gaines’s house, he was armed with a .357 magnum
pistol.  Gaines was talking on the phone
when it suddenly went dead around 12:10 p.m., and the phone was disconnected
from the wall and on the floor of his bedroom. 
Gaines then withdrew the maximum amount of money allowed from his credit
union’s drive-through ATM machine, while appellant was out of sight in the back
seat with a gun.  Shortly after that,
Gaines was dead in the middle of a dark road. 
The evidence also showed that he was shot, from a distance of at least
two feet, in the side of the neck and in the left side of his back with the
.357 magnum handgun appellant brought with him. 









Against the backdrop of this and other
evidence, the jury heard several statements appellant made concerning the
events surrounding Gaines’s death.  For
example, in one statement, appellant stated that he went to Gaines’s house
because Gaines was supposed to prepare his income taxes, and appellant was
already drunk when he arrived at Gaines’s home and drank the Smirnoff Ice.  Then, appellant fell asleep and awoke to
Gaines performing, or trying to perform, oral sex on him.  He “got mad” and started “tossing shit in his
house,” and knocked over the savings bank. 
Then, after Gaines had withdrawn the $200 and left the ATM, “he stopped
the Jeep in the middle of the road like we was gonna fight” and “I shot him . .
. I was so angry at the time.”  In a
different statement, appellant explained that he shot Gaines “cause he got me
drunk” and was performing oral sex on him. 
In yet another statement, appellant admitted he shot Gaines because “I
was angry and the fact he acted like it was nothing.” 

Thus, by his own statements, appellant
repeatedly admitted he shot Gaines because he was angry with him.  Appellant does not explain how the claimed
lack of evidence disproving that Gaines sexually assaulted him constitutes
reversible error.  The jury rejected his
claim of self-defense, and he does not challenge this non-finding on appeal.[4]  Moreover, appellant’s numerous accounts of
Gaines’s alleged behavior vary, and the jury was free to believe or disbelieve
them.  








The same is true regarding appellant’s
claim that Gaines agreed to prepare his tax returns and lend him $250 until his
income tax refund came in.  In
appellant’s statements, he variously explains that, in anger, he knocked over
the savings bank in the bedroom and picked up the money from it, or that Gaines
told him to take it, or that Gaines gave it to him, or that he did not know who
knocked it over.  In one statement,
appellant stated that Gaines withdrew the $200 from the ATM because Gaines said
“he was gonna let me use it.”  In another
statement, however, appellant described the incident but made no mention of any
agreement to loan him money.  Moreover,
appellant was in the back seat of Gaines’s car—out of view of the surveillance
cameras—while Gaines withdrew the $200 from his ATM.  Appellant, in one statement, claimed he could
not be seen because he was getting his tax papers, which had scattered, but in
the videotape, he claimed he was getting his “jacket and stuff.”  It is undisputed, however, that he remained
out of sight with the loaded .357 magnum handgun, and when the ATM transaction
was completed, he and Gaines drove to a dark and unlit road where appellant
shot and killed Gaines.  The jury could
have found appellant’s various explanations not credible and concluded Gaines
did not offer or agree to lend appellant the money.  

From appellant’s contradictory statements
and the physical evidence, the jury could have rejected appellant’s claims and
instead concluded that appellant intentionally caused Gaines’s death, and did
so while in the course of committing or attempting to commit a robbery.  We hold that the evidence is legally and
factually sufficient to support the jury’s findings.

III.      Conclusion

We hold that the evidence is both legally
and factually sufficient to support the jury’s findings and overrule
appellant’s issues.

 

 

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

Judgment
rendered and Memorandum Opinion filed April 28, 2005.

Panel
consists of Chief Justice Hedges and Justices Fowler and Edelman.

Do
Not Publish — Tex. R. App. P.
47.2(b).











[1]  At trial, Ms.
Cole testified that her conversation with Gaines was intimate, and she
testified that Gaines was bisexual. 
Others testified Gaines was homosexual.





[2]  Later, when
asked why he did not tell the truth when he was first interviewed, appellant
explained: “Because I was scared of getting in trouble for it . . . I felt like
they wouldn’t understand what he did to me. 
I didn’t feel they would understand my side of the story.  I was pressured by my conscience to turn
myself in . . . but I didn’t because I didn’t want to go to jail.”  





[3]  The State argues that appellant has
waived any alleged error by failing to produce a complete record, citing Texas
Rule of Appellate procedure 34.6(c)(5). 
This rule requires that, in a criminal case, if the appellant complains
that evidence is insufficient to support a finding of guilt, “the record must
include all the evidence admitted at the trial on the issue of guilt or
innocence and punishment.”  Tex. R. App. P. 34.6(c)(5).  The State points out that two exhibits
admitted at trial, one videotape and one audiotape containing some of
appellant’s statements, were not included in the record.  Our review of the record reveals that
appellant requested all exhibits, but these items remained in the custody of
the clerk’s office.  We have ordered the
reporter to supplement the record with these exhibits.  See Tex.
R. App. P. 34.6(d) (appellate court may direct the court reporter to
prepare, certify, and file a supplemental report’s record containing omitted
items).  Therefore, we find the State’s
waiver contention without merit.





[4]  In at least
two statements, appellant stated that Gaines got out of the Isuzu Rodeo to
fight, so appellant shot him.  In another
statement, appellant claimed that Gaines had gotten out of the Jeep and took a
swing at appellant before appellant backed up and shot him.  Appellant never contended that Gaines was
armed, and in fact, in the video statement, conceded he had no
weapons.  Also, appellant’s contention in
another statement that he and Gaines were “face to face” when he shot Gaines
was contradicted by the evidence Gaines was shot in the neck and back.